UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ECF CASE

------------------------------------X
: 
LETIZIA MARTINEZ DE GONZALEZ, as :
administratrix and executrix of :
the Estate of Emilio Martinez :
Manautou, as Trustee of the :
Emilio Martinez Manautou Trust, :
and as Trustee of the EMM Trust, :

            Plaintiff, :

    -against- :

UBS AG and UBS TRUSTEES LTD., :

        Defendants. :

------------------------------------X

**07 CIV 7462**

**COMPLAINT**

*Jury Trial Demanded*

JUDGE SULLIVAN

RECEIVED
AUG 22 2007
U.S.D.C. S.D. N.Y.
CASHIERS

     Plaintiff Letizia Martinez de Gonzalez ("Ms.
Gonzalez"), as administratrix and executrix of the Estate of
Emilio Martinez Manautou ("Dr. Martinez"), as Trustee of the
Emilio Martinez Manautou Trust (the "Martinez Family Trust"),
and the EMM Trust (the "EMM Trust"), by and through her
attorneys, Anderson & Ochs, LLP, as and for her complaint
against defendants UBS AG and UBS Trustees Ltd. (collectively
"UBS" or "Defendants"), states and alleges as follows:

## PRELIMINARY STATEMENT

    1.   This action arises from the breach of duties,
gross negligence and self-dealing by defendants, a major Swiss
bank and its overseas subsidiary, upon an 80-year-old,
unsophisticated, non-English-speaking Mexican national, lured by

the false and deceptive promises of a "private banking relationship" with its New York branch. The case is unusual in the duration, variety, and severity of ways in which UBS misused its trust to the substantial detriment of its customer during his lifetime, and upon his estate and trusts after his death.

2.    During the last year of his life, UBS coaxed Dr. Martinez, its longtime customer, into transferring millions of dollars away from its New York financial competitors, including Merrill Lynch and JP Morgan Chase, under the promise that it had established an off-shore trust, in Singapore, which would shelter his assets from taxation during his life and after his death. To that end, UBS destroyed long-existing relationships and estate plans Dr. Martinez had established over many years. Because "getting the money" was of the utmost most importance, UBS "got the money" before it had established the off-shore trust. It induced Dr. Martinez into believing the off-shore trust had been created, and to cover up this fact, it documented the transfer of about $7 million with sham account documents in the name of different entities.

3.    As Murphy's Law would dictate, Dr. Martinez died before the off-shore trust was funded, leaving his Estate in the lurch, with an entirely avoidable tax bill and expenses in the millions of dollars. The legal status of the $7 million introduced into the sham account resulted in endless, and

- 2 -

totally unnecessary, litigation among rival claimants, which is still unresolved.

4.    UBS's strategy throughout this debacle has been single-minded: to force a favorable settlement of its own liability, by freezing accounts on the basis of one phony pretext after another; by failing to invest such accounts in any return-bearing asset; by encouraging rival claimants to litigate; and, by denying any cooperation that would allow rival claimants to mediate their respective claims.  In sum, this is a case that manifests the supreme arrogance and self-interest with which a major financial institution can operate when its own interests are threatened: to the complete derogation of its customers' welfare.

## STATEMENT OF THE CASE

A.    The Parties

5.    Ms. Gonzalez (also known as Letizia Cecilia Martinez Cardenas) is a citizen of, and domiciled in, Mexico, a surviving daughter of Dr. Martinez, and is the duly appointed executrix of his Estate.

6.    Dr. Martinez was a citizen of Mexico, and was domiciled there.

7.    Upon information and belief, defendant UBS is an international financial services firm, headquartered in Switzerland.  Upon further information and belief, UBS provides

financial services including _inter_ _alia_ advisory and consulting services, underwriting, financing, and asset and wealth management worldwide. UBS systematically conducts extensive business in the United States, including in the State of New York. Various UBS affiliates are registered with the Secretary of State for the State of New York. UBS is a public company, traded in the United States on the New York Stock Exchange.

8.   Defendant UBS Trustees Ltd. ("UBS – Singapore") is a Singapore-based affiliate of UBS. Upon information and belief, UBS – Singapore systematically conducts extensive business in the United States, including in the State of New York.

B.   Jurisdiction and Venue

9.   This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332 as there is complete diversity between and among the parties.

10.   Venue is properly placed in this Court pursuant to 28 U.S.C. § 1391.

C.   Facts

EVENTS PRIOR
TO THE YEAR 2004

11.   By the beginning of 2004, Dr. Martinez was an octogenarian in ill-health. He was neither a citizen nor resident of the United States. He was a citizen and resident of

- 4 -

Mexico, who spoke only Spanish, and who relied exclusively on translators in dealing with entities such as UBS.

12.   Like many foreigners, Dr. Martinez was prompted to place his liquid assets in U.S. financial institutions and brokerage firms, attracted by the financial stability of the United States, and the promise of "private" banking relationships, signifying personalized investment guidance and treatment.

13.   To plan for his eventual passing, he had also sought estate planning advice from a New York law firm, with whose guidance he established two New York irrevocable trusts, the Martinez Family Trust and the EMM Trust, as part of the management of his financial affairs, including the investment, preservation and distribution of his assets during his lifetime and upon his death.

14.   In 1994, Dr. Martinez created the Martinez Family Trust, a New York grantor trust, and opened up various bank accounts with several banking institutions in New York, in the name of this Trust.  Dr. Martinez and his New York estate counselor, Robert J. Reger, Jr. ("Reger"), acted as co-trustees for the Martinez Family Trust.  The beneficiaries of such Trust, and the amount to be granted to them upon Dr. Martinez's death, changed several times over the years, but were generally his children and a few trusted friends.

15.    Dr. Martinez originally had two accounts with UBS (Account 202440 ("Account 440") in the name of the Martinez Family Trust, and Account 201995 ("Account 995") in the name of Dr. Martinez, individually).  Account 440 was the primary investment account; Account 995 was used to receive income and dividends thrown off from the investments in Account 440.  As of January, 2004, these accounts were funded with assets totaling approximately $6 million.

16.    In 1999, Dr. Martinez created the EMM Trust, also a New York grantor trust, established an account at Merrill Lynch in the name of the EMM Trust, and funded this account with $7 million in assets.  Dr. Martinez and Reger were also co-trustees of that Trust; however, the EMM Trust had at all times only one beneficiary: Alicia Trevino ("Ms. Trevino"), also a friend.

17.    By the beginning of 2004, Dr. Martinez, and/or his two Trusts, had the following in U.S. financial institutions based in New York: (i) with UBS: $12 million; (ii) with Merrill Lynch: $7 million; (iii) with JP Morgan Chase: $6 million.

UBS EXPOSED DR. MARTINEZ'S
ASSETS TO U.S. ESTATE TAXES

18.    At some point in early 2004, UBS discovered that it was mismanaging the two accounts it held in a manner which would unnecessarily expose Dr. Martinez's Estate to U.S. estate

taxes.  In particular, UBS apparently learned that, as a non-U.S. citizen, Dr. Martinez's U.S. assets – whether invested in tax exempt instruments (a strategy devised and implemented by UBS) or not – would, in either case, be subject to U.S. estate tax upon Dr. Martinez's death.

19.  The choice of U.S. Municipal bonds by UBS for Dr. Martinez was improper not only because such bonds were exposed to U.S. estate taxes, but because the logic of investing in tax free municipal instruments is limited to high-income, U.S. resident taxpayers, who, in exchange for not paying income tax, receive a far lower return than would be enjoyed on taxable bonds of equal quality.  Thus, UBS had Dr. Martinez invest in instruments which afforded him an inferior rate of return but nonetheless exposed his Estate to tax upon his death.

20.  Coinciding with the discovery of its improper investment strategies, UBS independently determined to initiate a full-court press to pull Dr. Martinez's U.S. financial assets away from its New York banking rivals – that is, the approximately $7 million held at Merrill Lynch (then in the name of the EMM Trust), and approximately $6 million from JP Morgan Chase – and have them consolidated with UBS and its affiliates.

21.  In the summer of 2004, UBS dispatched a completely inexperienced, but Spanish-speaking, "private banker" employee named Marisa Weinberger to become Dr. Martinez's

personal go-between. UBS found a marketing hook in the form of a new investment strategy it could sell to its client, to wit: instead of having his financial assets placed in the two New York Trusts established under the guidance of his New York law firm, UBS would have Dr. Martinez send all his money to a newly created "off shore" trust to be established in the nation of Singapore (the "Singapore Trust"). UBS proposed funding this Trust with the monies in Account 440 and Account 995 as well as any "new monies" Dr. Martinez would transfer over from UBS competitors.

22.    UBS would designate its own Singapore branch office, UBS - Singapore, to act as trustee of the new Singapore Trust. Thus, UBS pushed Dr. Martinez to surrender all decision-making authority to its Singapore affiliate, even including the naming, amending and removal of beneficiaries.

23.    The surrendering of so much control would have represented a complete reversal for Dr. Martinez. He was a man who often changed the beneficiaries of his two New York Trusts. In fact, in the years prior to and including 2004, Dr. Martinez had changed the beneficiaries of his two Trusts no fewer than eight times.

24.    UBS explained to Dr. Martinez that surrendering total control to UBS - Singapore was simply a ruse designed to satisfy Singapore authorities into accepting the new Trust's tax

status.   The apparent sole purpose for establishing a trust in
Singapore was to shield Dr. Martinez's assets from U.S. taxes.
However, given Dr. Martinez's advanced age (81 yeas old), and
the draconian rate of tax that would be incurred were Dr.
Martinez to die, time would be of the essence to establish the
Trust.

25.   As UBS explained it, Dr. Martinez would in fact
continue to control all of his assets held by the Singapore
Trust by informally sending what it described as "letters of
wishes" to UBS - Singapore.   UBS assured Dr. Martinez that these
"letters of wishes" would be privately and unofficially honored.
Thus, one version of UBS's business was to induce the Singapore
government into the false belief UBS - Singapore had real
control; the other version was to induce Dr. Martinez into
believing it had no such intention.

26.   To sell the Singapore plan, UBS had to drive a
wedge between Dr. Martinez and his New York law firm which had
spent years developing Dr. Martinez's estate plan.   In the
summer of 2004, Dr. Martinez appeared in the offices of his New
York lawyers and declared his intention to place all his U.S.
assets into what he explained as "one" account at UBS, that is,
the Singapore Trust.   Robert Reger, his New York lawyer and co-
trustee, objected.   Dr. Martinez insisted, and ordered the
transfer.

27.  Dr. Martinez's lack of confidence in his lawyer and co-trustee was apparently so complete that he also asked him to resign as co-trustee of both the Martinez Family Trust and the EMM Trust.  Reger was, in fact, formally replaced as co-trustee for both Trusts by Dr. Martinez's daughter, Ms. Gonzalez, in August, 2004.

28.  At or about the same time, or shortly thereafter, UBS falsely induced Dr. Martinez into believing that the Singapore Trust was established, and that assets, which Dr. Martinez ordered Reger to transfer from Merrill Lynch, were being placed into it.  Consistent with its wink-and-nod plan, UBS prepared, and Dr. Martinez signed, a "letter of wishes" in which he instructed UBS - Singapore to honor the following designation of beneficiaries: Letizia Martinez de Gonzalez (daughter); Luis Gerardo Martinez (son); Georgina Martinez (daughter); Roberto Delgado (ranch foreman, no relation); and Josefa Sicard (friend).

29.  In fact, Dr. Martinez's belief was completely in error.  UBS had not established the Singapore Trust, and, therefore, could not, and had not, opened any bank accounts owned by the Singapore Trust, into which Dr. Martinez's funds could be transferred.  However, UBS would not let such niceties interfere with receiving the ready bonanza for which it had labored so long.  So, UBS did what it needed to: it simply

concocted a fictitious account, which it styled no. 322826

("Account "826"), to receive $7 million in assets from Merrill

Lynch.

　　　　30.　Despite operating in a post-9/11 banking

environment, UBS did not bother to inform Dr. Martinez of the

opening of such an account, nor did UBS have him sign an account

application, or have him execute signature cards.  UBS simply

went into its old files of accounts closed years before, found

one in the name of the "Emilio Martinez Manautou - Trust,"

scratched out the old account number, and manually inserted

"322826."[1]  That was, and is, the only change made to the

obsolete Account 826.

　　　　31.　Thus, during the summer of 2004, UBS had

"created" a "new" account (with an opening date of "May 28,

2003") to receive over $7 million from a business rival.

Shortly thereafter, all of the $7 million in assets held by the

EMM Trust at Merrill Lynch were transferred to, and now held by,

Account 826, in the name of an old depositor.  From that point

forward, until his death, UBS would hide from Dr. Martinez the

---

[1]  The account application for Account 826 is comprised of a form in
which the account number originally written is "201995," which was one
of the original accounts opened by Dr. Martinez in the name of the
Martinez Family Trust in 1998. On some, but not all, of the pages the
original account number is interlineated and over it inserted the
number "322826." Every signature of Dr. Martinez contained in this
application is dated May 28, 2003.

fact that his $7 million was in a legal no-man's land; as far as he knew, all his money was in Singapore. He felt safe.

32.   To multiply its incompetence, UBS's own internal documentation showed the $7 million being received in favor of "Emilio Martinez Manautou." Thus, at the time of Dr. Martinez's death, at least three entities had conceivable rival claims to the $7 million, as a result of UBS's colossal blunderings: (1) the Singapore Trust, which, in the mind of Dr. Martinez and all of his beneficiaries, had been funded; (2) the Martinez Family Trust, the entity whose name was on UBS's sham account application; and (3) Emilio Martinez Manautou, personally, the entity whose name appears on UBS's internal transfer document.

33.   By no later than early September, 2004, Dr. Martinez had indeed signed off on all necessary documentation to establish the Singapore Trust and to receive funds from Merrill Lynch to that Trust.

34.   In late September, 2004, or early October, 2004, UBS retained its own legal counsel to opine on its tax-avoidance strategy, and received their counsel's legal opinion confirming the strategy.

35.   Nonetheless, UBS, for some unknown/unexplained reason, failed to implement this strategy. Even though the necessary documentation from Dr. Martinez to establish the Singapore Trust was legally completed as early as September,

2004, UBS apparently never funded the Singapore Trust which, according to UBS's counsel, lapsed, as a matter of law, upon Dr. Martinez's death on December 24, 2004.

36.  At the time of his death, Dr. Martinez's assets remained at various accounts with UBS; but, none of the assets had been moved to Singapore.  Worse yet, UBS had placed a huge portion of his assets in U.S. private securities, municipal bonds, and/or other investments, which were needlessly exposed to U.S. estate taxes.  For example, as late as November, 2004, UBS invested part of Dr. Martinez's assets in a newly created account at UBS (Account 325504) in U.S. Municipal bonds.  As a non-resident alien, Dr. Martinez's Estate owed estate tax to the U.S. government at the rate of 48% of their value on the date of death.  His Estate soon learned the ugly truth, and wrote a check to the U.S. Treasury in the amount of over $1,600,000.00.

37.  UBS's private banking team was responsible for the selection of investments, having total control of all his financial assets from the summer of 2004 forward.  Even short of moving all assets to the Singapore Trust, a tax device of its own urging, UBS could have placed his securities in assets not subject to U.S. estate tax, but it did not.  Indeed, UBS continued to actively place Dr. Martinez's assets into investments that not only were exposed to U.S. estate tax, but were grossly improper, such as U.S. "tax-free" municipal bonds.

38.    In the end, the Singapore Trust was never funded due to neglect and gross mismanagement of UBS, resulting in the inexcusable loss to Dr. Martinez's Estate of well over $1 million.

UBS FAILS TO FOLLOW
DR. MARTINEZ'S INSTRUCTIONS
WITH RESPECT TO OTHER ASSETS

39.    Coinciding with the time that UBS was pressing Dr. Martinez to consolidate all of his assets at UBS, Dr. Martinez independently determined to make certain changes with respect to his financial affairs as a result, in part, of his estrangement from Ms. Trevino, the sole beneficiary of the EMM Trust.

40.    First, Dr. Martinez determined to remove Ms. Trevino as a beneficiary of the Martinez Family Trust.[2] Thereafter, he directed Reger to move the funds held by the EMM Trust at Merrill Lynch into the account at UBS where the Martinez Family Trust account was held; and, he instructed UBS to terminate Ms. Trevino's credit cards.

41.    In the summer of 2004, Dr. Martinez and Reger executed a transfer form, which, by its terms, instructed Merrill Lynch to transfer the $7 million in assets held in the

---

[2]    At or about the same time that Dr. Martinez met with UBS to discuss transferring his other assets to them, Dr. Martinez amended the Martinez Family Trust eliminating a 12% interest in favor of Ms. Trevino and granting the additional interest to Ms. Gonzalez.

name of the EMM Trust to UBS.  Shortly thereafter, Dr. Martinez

sent his "letter of wishes" to UBS – Singapore, designating the

beneficiaries of the Singapore Trust.  Ms. Trevino is not named

as a beneficiary of the Singapore Trust.

42.  In September, 2004, Dr. Martinez signed the

account opening forms for the Singapore Trust.  The first

instrument defined "Beneficiary" as Dr. Martinez, his children

and the same two friends who were also beneficiaries of the

Martinez Family Trust.  The "Beneficiaries" group did not

include Ms. Trevino.

43.  Notwithstanding Dr. Martinez's clear

instructions, UBS, on its end, failed and neglected to document

the asset transfer from Merrill Lynch in a manner clearly

reflective of his intentions.  In late 2005, it appears that

counsel for Ms. Trevino spoke to representatives of UBS;

following on these discussions, Ms. Trevino commenced litigation

in the Texas Probate Court claiming that the funds transferred

from Merrill Lynch into Account 826 at UBS belong to her and not

to the Martinez Family Trust or Dr. Martinez's Estate.

44.  Had UBS handled the transfer of the funds from

the EMM Trust at Merrill Lynch in a manner consistent with Dr.

Martinez's intent and instructions – either by directly

transferring the monies into the Martinez Family Trust account

existing at UBS, or properly denominating Account 826, or timely

completing and funding the Singapore Trust – Ms. Trevino would have no basis to claim that funds in the Account belong to her and not Dr. Martinez's Estate or the Family Trust.

EVENTS AFTER
DR. MARTINEZ'S DEATH

45.     Within a few days after Dr. Martinez died, UBS realized the extent of the debacle it had created. It had failed to create and fund the Singapore Trust, completely at odds with Dr. Martinez's and his family's expectations.  Even worse, it realized that at least $7 million transferred to it sixth months earlier had not been placed in any current account opened by Dr. Martinez, or the Martinez Family Trust, or the EMM Trust, or the Singapore Trust.  With this realization, it hunkered down.  It refused any direct communication with Ms. Gonzalez, who it knew to be the sole remaining Trustee of the Trusts, and sole executor of her father's will.  Suddenly, Ms. Weinberger was incommunicado.  UBS directed all communications with Ms. Gonzalez and her and the Estate's representatives to be routed through its outside lawyers, White & Case L.L.P.

46.  As of the date of Dr. Martinez's death in December, 2004, UBS held approximately $20 million of Estate/Trust monies.[3]  Beginning in or about April, 2005, through December, 2005, UBS agreed to conditionally release to Ms. Gonzalez certain monies held in her name, Dr. Martinez's name, and in the Martinez Family Trust, leaving approximately $4.5 million currently with UBS.  UBS has refused to release, and continues to refuse to release, the remaining funds, of more than $4.5 million.

47.  In or about August, 2005, Letters Testamentary issued in the Texas Probate Court appointing Ms. Gonzalez the Executrix of the Estate of Dr. Martinez in connection with all U.S.-based assets held in the name and for the benefit of his Estate.  There was, and is, no legal basis, for UBS to retain any monies belonging to Dr. Martinez's Estate or for the beneficiaries of the Martinez Family Trust.

48.  In denying the Trusts their legitimate funds, UBS has used several pretexts, each one barely aligned with some legal principle; but all designed for no other purpose than

---

[3] These monies were held as follows:

| | | |
|---|---|---|
| Account No. 202440 | $12.5 million | (Dr. Martinez or Trust account) |
| Account No. 322826 | $3.1 million | (Dr. Martinez w/Ms. Gonzalez as ben.) |
| Account No. 325504 | $4.0 million | (Martinez Family Trust) |
| Account No. 201995 | $834,000 | (joint: Dr. Martinez & Ms. Gonzalez) |
| Account No. 329435 | $0.0 | (Singapore Trust, funds from 202440) |
| Account No. 329445 | $0.0 | (Singapore Trust, funds from 322826) |

denying the Trusts their own monies until a satisfactory release can be provided.

49.   While withholding monies, UBS failed to pay any interest, or a sub-standard interest or return, to its rightful owners.  For a period of approximately eight months in the year 2006, UBS failed to invest the entire account in even money market funds or certificates of deposit, thus causing the Martinez Family Trust to incur hundreds of thousands of dollars in lost interest and other possible earnings.

## CONCLUSION

50.   The failure of UBS to properly establish an account into which at least $7 million was transferred in the summer of 2004 caused Dr. Martinez, the two Trusts, and his Estate, to enter a legal no-man's land with respect to the ownership of such funds.  The sham account that UBS used to temporarily receive the funds was in the name of the "Emilio Martinez Manautou - Trust," thus creating the presumption, under the banking laws of the State of New York, of ownership by such entity.  In the mind of Dr. Martinez, himself, the $7 million transferred to UBS was supposed to be placed in accounts owned by the Singapore Trust, which, in fact, UBS had failed to establish at the time of the transfer.  A third possibility of ownership was the EMM Trust - the entity from which the $7 million had been transferred when held at Merrill Lynch.  Yet

another ownership possibility was in Dr. Martinez, personally, which would mean that his Estate held claim of ownership after his death.

51. Notwithstanding that it was UBS that (i) persuaded Dr. Martinez to transfer all funds into the Singapore Trust to begin with, (ii) misrepresented the fact that the Singapore Trust had been created during the summer of 2004, (iii) falsely induced Dr. Martinez into believing that the $7 million transferred from Merrill Lynch was going into the Singapore Trust, (iv) placed the $7 million into a made-up account which, nevertheless, bore the name "Emilio Martinez Manautou - Trust" as account owner, and (v) internally documented the transfer as arriving for the benefit of Emilio Martinez Manautou, personally; UBS, for the following two years after Dr. Martinez's death, deliberately and maliciously conducted a campaign to create further doubt and dissension among the various entities to whom such funds might have belonged, for the sole purpose of placing additional pressure on Ms. Gonzalez to settle all claims against UBS.

52. Unofficially and privately, UBS communicated with the attorneys representing Ms. Trevino, the sole beneficiary of the EMM Trust, intimating that all disputed funds were intended for her sole benefit, and that, in any future litigation between such beneficiary and the EMM Trust, or Ms. Gonzalez, UBS would

provide testimony (always unidentified) to such effect.  In fact, any such testimony would have pertained exclusively to a small window of time in late 2004 when Dr. Martinez, still falsely believing that the Singapore Trust had been created and funded, may have attempted to channel part of the Singapore Trust assets towards such beneficiary.

53.  UBS's counsel, however, did not feel compelled to draw a distinction on such matters, and allowed the false impression to be created that such testimony would have pertained to the more relevant period of time in which the $7 million was in fact received.  The results were again predictable: spurred on by UBS's private urgings, Ms. Trevino did, in fact, initiate litigation against Dr. Martinez.  As a result of such litigation, fomented wrongfully by UBS, and due entirely to the incompetence of UBS in establishing, or failing to establish, proper bank accounts, Ms. Gonzalez and the Trusts have been required to incur hundreds of thousands of dollars in damages and may incur millions of dollars in damages as a result of the litigation outcome generated by such conduct.

**AS FOR A**
**FIRST CAUSE OF ACTION**

(Breach of Fiduciary Duty)

54.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 53 above as though fully set forth herein.

55.   As investment advisor and asset manager for Dr. Martinez, the Martinez Family Trust, and the EMM Trust, UBS was a fiduciary to Dr. Martinez and the beneficiaries, and trustees, of the Martinez Family Trust and the EMM Trust, and was required to act with the highest obligations of good faith, loyalty, fair dealing, due care, and candor.

56.   As set forth above, UBS breached its fiduciary duties to Dr. Martinez and the beneficiaries, and trustees, of the Martinez Family Trust and the EMM Trust, by inter alia failing to establish and duly fund accounts at UBS, neglecting to make proper asset dispositions and transfers, mismanaging investments and investment vehicles, and failing to create and fund the Singapore Trust - all pursuant to its promises to, and the clear instructions and intentions of, Dr. Martinez.

57.   As a direct, proximate and foreseeable result thereof, the Estate of Dr. Martinez, and the beneficiaries, and surviving Trustee, of the Martinez Family Trust and the EMM

Trust, have been specifically injured and have suffered substantial damages.

58. As more fully set forth above, UBS acted with reckless and willful disregard for the rights of Dr. Martinez, his Estate, and the beneficiaries, and surviving Trustee, of the Martinez Family Trust and the EMM Trust.

59. By virtue of the foregoing, Plaintiff is entitled to judgment for compensatory and punitive damages in an amount to be determined at trial.

### AS FOR A
### SECOND CAUSE OF ACTION

(Breach of Fiduciary Duty)

60. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 59 above as though fully set forth herein.

61. As trustee to the Singapore Trust, UBS – Singapore was a fiduciary to Dr. Martinez and the beneficiaries of the Martinez Family Trust – the intended beneficiaries of the Singapore Trust – and was required to supervise, monitor, dispose of, and distribute the assets directed to the Singapore Trust with the highest obligations of good faith, loyalty, fair dealing, due care, and candor.

62. As set forth above, UBS – Singapore breached its fiduciary duties to Dr. Martinez and the beneficiaries, and

trustees, of the Martinez Family Trust, by inter alia failing to duly create and fund the Singapore Trust, pursuant to Dr. Martinez's intentions and instructions, prior to his death.

63. As a direct, proximate and foreseeable result thereof, the Estate of Dr. Martinez, and the beneficiaries, and surviving Trustee, of the Martinez Family Trust, have been specifically injured and have suffered substantial damages.

64. As more fully set forth above, UBS – Singapore acted with reckless and willful disregard for the rights of Dr. Martinez, his Estate, and the beneficiaries of the Martinez Family Trust.

65. By virtue of the foregoing, Plaintiff is entitled to judgment for compensatory and punitive damages in an amount to be determined at trial.

## AS FOR A
## THIRD CAUSE OF ACTION

(Aiding and Abetting Breach of Fiduciary Duty)

66. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 65 above as though fully set forth herein.

67. As set forth above, by engaging in reckless and willful conduct in connection with the establishment and funding of accounts at UBS, the proper dispositions and transfers of assets, the mismanagement of investments and investment

vehicles, and the creation and funding of the Singapore Trust, UBS breached its fiduciary duties owing to Dr. Martinez and the beneficiaries, and trustees, of the Martinez Family Trust and the EMM Trust.

68.  Authorized representatives of UBS - Singapore knew that UBS had acted with reckless and willful disregard of the rights of Dr. Martinez, his Estate, and the beneficiaries, and trustees, of the Martinez Family Trust and the EMM Trust, such as to cause them substantial damages, and aided and abetted such conduct, as more fully set forth above, including by inter alia acting in concert with UBS and failing to disclose UBS's conduct to Dr. Martinez, his representatives, and/or to the beneficiaries, or trustees, of the Martinez Family Trust and the EMM Trust.

69.  As a direct, proximate and foreseeable consequence thereof, Dr. Martinez, his Estate, and the beneficiaries, and surviving Trustee, of the Martinez Family Trust and the EMM Trust, have been specifically injured and have suffered substantial damages.

70.  By virtue of the foregoing, Plaintiff is entitled to judgment for damages in an amount to be determined at trial.

**AS FOR A**
**FOURTH CAUSE OF ACTION**

(Aiding and Abetting Breach of Fiduciary Duty)

71.  Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 70 above as though fully set forth herein.

72.  As set forth above, by engaging in reckless and willful conduct in connection with the creation and funding of the Singapore Trust, UBS - Singapore breached its fiduciary duties owing to Dr. Martinez, his Estate, and the beneficiaries of the Martinez Family Trust.

73.  Authorized representatives of UBS knew that representatives of UBS - Singapore had acted with reckless and willful disregard of the rights of Dr. Martinez, his Estate, and the beneficiaries of the Martinez Family Trust such as to cause them substantial damages, and aided and abetted such conduct, as more fully set forth above, including by inter alia acting in concert with representatives of UBS - Singapore, and failing to disclose the conduct of representatives of UBS - Singapore to Dr. Martinez, his representatives, and/or to the beneficiaries, or trustees, of the Martinez Family Trust.

74.  As a direct, proximate and foreseeable consequence thereof, Dr. Martinez, his Estate, and the

beneficiaries of the Martinez Family Trust have been specifically injured and have suffered substantial damages.

75.   By virtue of the foregoing, Plaintiff is entitled to judgment for damages in an amount to be determined at trial.

### AS FOR A
### FIFTH CAUSE OF ACTION

(Breach of Contract)

76.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 75 above as though fully set forth herein.

77.   Dr. Martinez and Defendants entered into a duly formed and bargained-for agreement, pursuant to which Defendants agreed to manage, dispose of, and distribute certain assets and investments of Dr. Martinez and his Trusts according to his intentions and instructions, in exchange for valuable consideration, including the payment of fees.

78.   As more fully set forth above, Defendants breached their obligations under the agreement to Dr. Martinez.

79.   As a direct, proximate and foreseeable consequence thereof, Dr. Martinez, his Estate, and the beneficiaries of the Martinez Family Trust and EMM Trust have been specifically injured and have suffered substantial damages.

80.   By virtue of the foregoing, Plaintiff is entitled to judgment for damages in an amount to be determined at trial.

**AS FOR A**
**SIXTH CAUSE OF ACTION**

(Breach of Third Party Beneficiary Contract)

81.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 80 above as though fully set forth herein.

82.   Dr. Martinez and Defendants entered into a duly formed and bargained-for agreement, pursuant to which Defendants agreed to manage, dispose of, and distribute certain assets and investments of Dr. Martinez and his Trusts according to his intentions and instructions, in exchange for valuable consideration, including the payment of fees.

83.   The beneficiaries of the Martinez Family Trust and the EMM Trust are intended third-party beneficiaries of the agreement between Dr. Martinez and Defendants.

84.   As more fully set forth above, UBS breached its obligations under the agreement with Dr. Martinez.

85.   As a direct, proximate and foreseeable consequence thereof, the beneficiaries of the Martinez Family Trust and EMM Trust have been specifically injured and have suffered substantial damages.

86.   By virtue of the foregoing, Plaintiff is entitled to judgment for damages in an amount to be determined at trial.

## AS FOR A
## SEVENTH CAUSE OF ACTION

(Breach of the Implied Covenant
of Good Faith and Fair Dealing)

87.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 86 above as though fully set forth herein.

88.   As more fully set forth above, Dr. Martinez and Defendants entered into a duly formed and bargained-for agreement, pursuant to which Defendants agreed to manage, dispose of, and distribute certain assets and investments of Dr. Martinez and his Trusts according to his intentions and instructions.

89.   In accordance with such agreement, Defendants owed Dr. Martinez a duty to act in good faith and conduct fair dealing.

90.   As more fully set forth above, Defendants breached that duty, by inter alia acting with gross disregard of the interests of Dr. Martinez and the beneficiaries of the Martinez Family Trust and the EMM Trust, deliberately and recklessly failing to place the interests of Dr. Martinez and the beneficiaries to the Martinez Family Trust and the EMM Trust on equal footing with their own interests, and acting with a conscious and knowing indifference to the interests of Dr.

Martinez and the beneficiaries to the Martinez Family Trust and the EMM Trust.

91.   As a direct, proximate and foreseeable consequence thereof, Dr. Martinez, his Estate, and the beneficiaries of the Martinez Family Trust and EMM Trust have been specifically injured and have suffered substantial damages.

92.   By virtue of the foregoing, Plaintiff is entitled to judgment for damages in an amount to be determined at trial.

### AS FOR AN
### EIGHTH CAUSE OF ACTION

(Unjust Enrichment)

93.   Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 92 above as though fully set forth herein.

94.   Defendants collected substantial fees from Dr. Martinez, purportedly as compensation for the management and supervision of assets and investments held by UBS.

95.   Defendants grossly mismanaged Dr. Martinez's assets and investments, and have been enriched through the collection of unearned and excessive fees.

96.   Defendants' retention of the fees conferred by Dr. Martinez would be unjust.

97.  Equity and good conscience require Defendants to make restitution to the Estate of Dr. Martinez and the beneficiaries of the Martinez Family Trust and the EMM Trust.

98.  By virtue of the foregoing, Plaintiff is entitled to an equitable award of restitution.

### AS FOR A
### NINTH CAUSE OF ACTION

(Negligence)

99.  Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 98 above as though fully set forth herein.

100. As set forth above, Defendants owed a duty to Dr. Martinez, his Estate, and the beneficiaries of the Martinez Family Trust and the EMM Trust to manage and supervise Dr. Martinez's assets, accounts, and investment vehicles, pursuant to the clear instructions and intentions of Dr. Martinez.

101. As set forth above, Defendants failed to exercise the necessary degree of care to discharge such duty.

102. As a direct, proximate and foreseeable result of such failure, Dr. Martinez, his Estate, and the beneficiaries, and surviving Trustee, of the Martinez Family Trust and EMM Trust have been specifically injured and have suffered substantial damages.

103. By virtue of the foregoing, Plaintiff is entitled to judgment for damages in an amount to be determined at trial.

## AS FOR A
## TENTH CAUSE OF ACTION

(Gross Negligence)

104. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 103 above as though fully set forth herein.

105. As set forth above, Defendants owed a duty to Dr. Martinez, his Estate, and the beneficiaries of the Martinez Family Trust and the EMM Trust to manage and supervise Dr. Martinez's assets, accounts, and investment vehicles, pursuant to the clear instructions and intentions of Dr. Martinez.

106. As set forth above, Defendants acted wantonly and recklessly with respect to the discharge of such duty.

107. As a direct, proximate and foreseeable result of the wanton and reckless conduct of Defendants, Dr. Martinez, his Estate, and the beneficiaries, and surviving Trustee, of the Martinez Family Trust and EMM Trust have been specifically injured and have suffered substantial damages.

108. By virtue of the foregoing, Plaintiff is entitled to judgment for compensatory and punitive damages in an amount to be determined at trial.

### AS FOR AN
### ELEVENTH CAUSE OF ACTION

(Fraud in the Inducement)

109. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 108 above as though fully set forth herein.

110. Representatives of UBS repeatedly falsely stated and misrepresented to Dr. Martinez their intentions to provide the highest degree of care and utmost diligence in the management and supervision of Dr. Martinez's assets, if Dr. Martinez elected to follow the investment strategies proposed by UBS.

111. Representatives of UBS repeatedly falsely stated and misrepresented to Dr. Martinez that the Singapore Trust had been duly established such that assets transferred to UBS and UBS - Singapore would be placed in an off-shore trust and shielded from U.S. taxation.

112. The representations and omissions made, or failed to be disclosed, by representatives of UBS were untrue, deceptive, and misleading in material respects and were known by them and/or in the exercises of reasonable care should have been known to be untrue, deceptive and/or misleading in a material respect.

113. The representatives of UBS knew and/or should have known that their conduct and representations reasonably caused Dr. Martinez to rely on such representations.

114. The representatives of UBS knew and/or should have known that their representations and concealment were false, incomplete and misleading at the time they were made, and/or failed to be disclosed, to Dr. Martinez.

115. Dr. Martinez reasonably believed the misrepresentations of the representatives of UBS, and reasonably relied on the truth and completeness of these misrepresentations, when he decided to transfer assets to UBS, and permit UBS to manage and supervise his assets and investments.

116. As a direct, proximate and foreseeable result of Defendant's false statements and misrepresentations, Dr. Martinez, his Estate, and the beneficiaries, and surviving Trustee, of the Martinez Family Trust and EMM Trust have been specifically injured and have suffered substantial damages.

117. By virtue of the foregoing, Plaintiff is entitled to judgment for compensatory and punitive damages in an amount to be determined at trial.

### AS FOR A
### TWELFTH CAUSE OF ACTION

(Imposition of a Constructive Trust)

118. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 117 above as though fully set forth herein.

119. At the time UBS received assets and investments belonging to Dr. Martinez and the beneficiaries of Trusts he had established, UBS was a fiduciary of Dr. Martinez, his Estate, and beneficiaries of the Martinez Family Trust and the EMM Family Trust.

120. Plaintiff, on behalf of the Estate of Dr. Martinez, and beneficiaries of the Martinez Family Trust and the EMM Family Trust, is entitled to the impression of a constructive trust upon all funds transferred, either directly or indirectly, to UBS by, or on behalf of, Dr. Martinez.

### AS FOR A
### THIRTEENTH CAUSE OF ACTION

(Declaratory Judgment)

121. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 120 above as though fully set forth herein.

122. Despite due demand, UBS continues to wrongly hold assets belonging to the Estate of Dr. Martinez and the beneficiaries of the Martinez Family Trust and the EMM Trust.

123. There exists a real, actual and present controversy with respect to UBS's right to retain such assets.

124. Plaintiff has no adequate remedy at law.

125. Plaintiff is entitled a declaratory judgment finding that UBS has no right to retain the funds transferred to Defendants by, and/or on behalf of, Dr. Martinez.

### AS FOR A
### FOURTEENTH CAUSE OF ACTION

(Permanent Injunction)

126. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 125 above as though fully set forth herein.

127. As a consequence of Defendants' wanton, malicious, and wholly illegal refusal to return funds belonging to the Estate of Dr. Martinez and the beneficiaries of the Martinez Family Trust and the EMM Trust, the Estate of Dr. Martinez and the beneficiaries of the Martinez Family Trust and the EMM Trust have suffered, and continue to suffer, irreparable harm.

128. Plaintiff has no adequate remedy at law.

129. Plaintiff is entitled to a permanent mandatory injunction ordering Defendants to turn over all assets, funds, and investments transferred to Defendants by, and/or on behalf of, Dr. Martinez.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff Letizia Martinez de Gonzalez, as administratrix and executrix of the Estate of Emilio Martinez Manautou, as Trustee of the Martinez Family Trust, and the EMM Trust, prays for judgment against defendants as follows:

(i)    Compensatory damages in an amount to be determined at trial and believed to be not less than $3,000,000.

(ii)   Punitive damages in an amount to be determined at trial.

(iii) Disgorgement of all fees conferred upon defendants by, or on behalf of, Dr. Martinez and/or his representatives since June of 2004.

(iv)   Issuing and entering a declaratory judgment finding that defendants have no right to retain the funds transferred to defendants by, and/or on behalf of, Dr. Martinez.

(v)    Issuing and entering a preliminary and permanent injunction, ordering defendants to turn over all assets, funds, and investments transferred to defendants by, and/or on behalf of, Dr. Martinez.

```
Dated:  New York, New York
        August 21, 2007
```

**ANDERSON & OCHS, LLP**

By: _____
        Mitchel H. Ochs (MO-7796)

369 Lexington Avenue
Sixteenth Floor
New York, New York 10017
(212) 661-3080

*Attorneys for Plaintiff*