SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

LETIZIA MARTINEZ DE GONZALEZ, as
administratrix and executrix of the Estate of Emilio     :   **ECF CASE**
Martinez Manautou, as Trustee of the Emilio Martinez
Manautou Trust, and as Trustee of the EMM Trust,    :

                                          Case No. 07-CV-7462
         Plaintiff-Counterclaim Defendant,    :  (RJS)

           -against-                      :

UBS AG and UBS TRUSTEES LTD.,            :

         Defendants-Counterclaim Plaintiff,   :

           and                       X

UBS AG,

         Third-Party Plaintiff,

           -against-

ROBERT J. REGER, JR. and THELEN, REID, BROWN,
RAYSMAN & STEINER, LLP,

         Third-Party Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**PLAINTIFF'S MEMORANDUM OF LAW IN
SUPPORT OF HER MOTION COMPELLING UBS
TO RELINQUISH BANK DEPOSITS HELD AND
BELONGING TO HER FATHER'S ESTATE**

Anderson & Ochs, LLP
369 Lexington Avenue, 16th Floor
New York, New York 10017
Telephone: (212) 661-3368

Attorneys for Plaintiff Letizia
Martinez de Gonzalez

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................i-ii

INTRODUCTION.............................................................................................. 2

FACTS............................................................................................................4

   1. Background ............................................................................ 4

   2. The Account Opening Forms................................................... 5

   3. Nature of this Action............................................................. 6

ARGUMENT:

UBS IS REQUIRED TO RELINQUISH
ALL REMAINING DEPOSITS TO MS.
GONZALEZ................................................................... 7

   1. UBS is Duty Bound to Turn Over the Remaining
Deposits ................................................................................ 7

   2. UBS's Form of General Terms and Conditions for its
Accounts Provides No Basis to Withhold the
Account.................................................................................. 8

     a. UBS Has No Right to Withhold the Estate Tax Amount ................ 8

     b. UBS Has Not Right to Withhold the Attorneys' Fees
Amount ................................................................................ 13

CONCLUSION ............................................................................................ 16

## TABLE OF AUTHORITIES

### Cases

*Auerbach v. Mr. & Mrs. Foster's Place, Inc.*, 128 Misc. 875, 877
(N.Y. Mun. Ct., City of N.Y. 1927) ..............................................................................13

*City of Corpus Christi v. Bayfront Assocs., Ltd.*, 814 S.W.2d 98, 104
(Tex. Ct. App., 13th Dist. 1991) ............................................................................11, n.4

*Crawford v. West Side Bank*, 100 N.Y. 50, 53, 2 N.E. 881 (1885) ....................................7

*DiPerna v. American Broadcasting Cos.,* 200 A.D.2d 267, 612 N.Y.S.2d 564
(1st Dep't 1994) ................................................................................................................15

*Eastchester v. Mt. Vernon Trust Co.*, 173 A.D. 482, 159 N.Y.S. 289
(2d Dep't 1916) ..................................................................................................................7

*Farm Bureau Mut. Ins. Co. v. Carr*, 255 Kan 591, 528 P.2d 134 (Kan. 1974) ...............10

*First African Trust Bank v. Bankers Trust Co.*, 1995 U.S. Dist. LEXIS 9952
(S.D.N.Y. 1995) .............................................................................................................. 7-8

*Horowitz v. 1025 Fifth Avenue., Inc.,* 34 A.D.3d 248, 825 N.Y.S.2d 5
(1st Dep't 2006) ................................................................................................................15

*Kaufman v. Guest Capital, L.L.C.,* 386 F. Supp.2d 256, 274 (S.D.N.Y. 2005) ................9

*Matter of Lipper Holdings v Trident Holdings*, LLC, 1 A.D.3d 170, 171,
766 N.Y.S.2d 561 (1st Dep't 2004) ................................................................................13

*McPhee & McGinnity Co. v. Union Pacific R. Co.*, 158 Fed. Rep. 5, 17
(8th Cir. 1907) ..................................................................................................................12

*N.Y. Metal Ceiling Co. v. City of N.Y.*, 133 A.D. 110, 117 N.Y.S. 632
(1st Dep't 1909) ................................................................................................................10

*Opperman v. Heritage Mut. Ins. Co.*, 1997 S.D. 85, 566 N.W.2d 487 (S.D. 1997) ........10

*Pataki v. N.Y. State Assembly*, 190 Misc. 2d 716
(N.Y. Sup. Ct., Albany County 2002) ......................................................................... 12-13

*Reiss v. Fin. Performance Corp.,* 97 N.Y.2d 195, 764 N.E.2d 958, 961,
738 N.Y.S.2d 658 (N.Y. 2001) ........................................................................................9

*Stewart v. Marvel*, 101 N.Y. 357, 4 N.E. 743 (N.Y. 1886) ............................................12

*Superb Gen. Contr. Co. v. City of New York*, 39 A.D.3d 204, 833 N.Y.S.2d 64
(1st Dep't 2007) ...........................................................................................................13

*Thomson v. N.Y. Trust Co.,* 266 A.D. 384, 42 N.Y.S.2d 145 (1st Dep't 1943) ...............................8

*U.S. v. Sec. Mgm't Co., Inc.*, 96 F.3d 260 (7th Cir. 1996) ...............................................11

*Virginia v. Tennessee*, 148 U.S. 503, 519 (1893) .........................................................10

*Weissman v. Sinorm Deli*, 88 N.Y.2d 437, 446, 669 N.E.2d 242, 246, 646 N.Y.S.2d 308, 312
(N.Y. 1996) ................................................................................................................. 13

## Other Authorities

Corbin on Contracts, Vol. 5, at 309-18, n.594 (1982) .................................................. 11

McKinney's N.Y. Estate, Powers and Trusts Law § 11-1.1 (2007) ................................. 8

Williston on Contracts, 4th ed., §§ 32.6, 32.10 (1990).......................................... 10, 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
                    :

LETIZIA MARTINEZ DE GONZALEZ, as         **ECF CASE**
administratrix and executrix of the Estate of
Emilio Martinez Manautou, as Trustee of the       :
Emilio Martinez Manautou Trust, and as Trustee   :
of the EMM Trust,

                    :

         Plaintiff-Counterclaim Defendant,        Case No. 07-CV-7462 (RJS)

                    :

           -against-

                    :

UBS AG and UBS TRUSTEES LTD.,

                    :

         Defendants-Counterclaim Plaintiff

                    :

            and

                    :

UBS AG,

                    :

         Third-Party Plaintiff,

                    :

           -against-

                    :

ROBERT J. REGER, JR. and THELEN, REID,
BROWN, RAYSMAN & STEINER, LLP,        :

         Third-Party Defendants.         :

                    :

------------------------------------------------------------- X

### PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER MOTION COMPELLING UBS TO RELINQUISH BANK DEPOSITS HELD AND BELONGING TO HER FATHER'S ESTATE

INTRODUCTION

Plaintiff Letizia Martinez de Gonzalez, as administratrix and executrix of the Estate of Emilio Martinez Manautou ("Dr. Martinez"), as Trustees of the Emilio Martinez Manautou Trust, and the EMM Trust ("Ms. Gonzalez" or "Plaintiff"), respectfully submits this Memorandum of Law in support of her motion for an Order directing defendant UBS AG ("UBS") to release, and distribute, to her, more than $4.9 million in an account with UBS in the name, and for the benefit, of Ms. Gonzalez and the other beneficiaries of the estate and trusts of Dr. Martinez.

UBS itself is unconvinced by its own arguments for continuing to hold deposits for more than three years after Dr. Martinez's death; the fourth in a series of pretexts/excuses, UBS for the first time invokes standard account opening forms with only thinly-veiled reference to their specific terms, claiming the forms entitle it to continue to hold millions of dollars, in perpetuity, for its own financial gain or protection, and as it sees fit.  When Ms. Gonzalez sought leave of this Court to request the release of these deposits, UBS opposed that request in its entirety, but then, when it appeared in Court, agreed, with the aid of, and in open, Court, to release substantially all these deposits – other than $1.6 million, an amount equal to the estate taxes *already* paid (the "Estate Tax Amount") – before it then reneged on that agreement, unilaterally claiming a right to hold back an additional approximately $1 million apparently representing what it has decided is a sufficient amount to "secure the payment of" future "legal fees" it speculates it might incur in defending the claims against it in this action (the "Legal Fees Amount"), before it then again refused to return any of the $4.9 million in deposits unless and only if Ms. Gonzalez agreed to forego her legal right (and, indeed, her legal duty) to seek in this

Court the return of the Estate Tax and Legal Fee Amounts on behalf of all Estate and Trust beneficiaries.

UBS's current argument is only the latest in a series. Indeed, for more than three years, and admittedly with no legal claim, right, or interest, UBS, for variously stated, self-serving reasons, has taken upon itself to refuse (as if serving the roles of both judge and jury) to return more than $4.9 million in deposits unquestionably and indisputably belonging to the Estate of Dr. Martinez; first, refusing to turn over any money unless and until Ms. Gonzalez was duly qualified as authorized legal representative of her father's estate (which she has been for more than two years); then refusing until all taxes due and owing for the estate were fully paid (which they have been more than two years ago); and then only if all "known" and/or "potential" beneficiaries of Dr. Martinez's estate came forward, consented to the release of the deposits to Ms. Gonzalez and gave indemnities to UBS in connection with the release of those monies (which they all have agreed to do).

As detailed further below, no fair reading of the forms of general terms for its accounts permits the Bank to continue to hold the Estate's money; UBS's strained read of a form – which, at most, governs the relationship between Dr. Martinez, as depositor, and UBS, as bank depositee – to give it a *de facto* indemnity for claims having no relationship with UBS's management or administration of Dr. Martinez's accounts would not only create an absurd result, but contravenes long-standing applicable maxims of contract interpretation. Indeed, UBS's ever-shifting, now barely, if at all, credible arguments, all resulting in a betrayal of what should be its principal duty – *i.e.*, to return the money its holding to, and as the rightful owners direct – reveal its true motives: to continue to hold the Estate's money hostage to advance some litigation

advantage in the underlying lawsuit. The good offices of this Court should not be thus

misused/abused.

FACTS

The facts relevant to this disposition of the motion are straightforward and not in

dispute.

1.          Background

As of the date of Dr. Martinez's death in December, 2004, UBS held

approximately $12.0 million in deposits in Account YR-202440 ("Account 440"). Account 440

was originally opened in or about May, 2003, in the name and for the benefit of Dr. Martinez

individually; the account opening forms reflect Dr. Martinez to be the sole depositor. A copy of

what has been represented to be the Account Application for Account 440 is annexed as Exhibit

1 to the Affidavit of Mitchel H. Ochs, Esq., sworn to January 18, 2008 ("Ochs Aff."). At some

point in 2004, Account 440 was re-styled in the name "Dr. Emilio Martinez Manautou Trust." A

copy of select pages from a banking statement for Account 440, dated November 30, 2007, is

annexed as Exhibit 2 to the Ochs Aff. As of January, 2008, UBS held approximately $4.9

million in Account 440. *See* Ex. 2.

On or about August 22, 2005, Letters Testamentary issued in Texas Probate Court

duly appointing Ms. Gonzalez as legal representative of the Estate of her father in connection

with all U.S.-based assets held in the name, and for the benefit, of his Estate. A copy of the

Letters Testamentary is annexed as Exhibit 3 to the Ochs Aff.

In or about September, 2005, approximately $1.6 million was paid directly to the

Internal Revenue Service by UBS from Account 440 to pay estimated estate taxes. In or about

November, 2006, the Estate received an Internal Revenue Service Estate Tax Closing Letter

fixing the final estate tax liability, reflecting that all estate taxes due and owing by the Estate

have been paid, and closing out the file. A copy of the IRS Closing Letter is annexed as Exhibit 4 to the Ochs Aff.[1]

2.                The Account Opening Forms

Now that Ms. Gonzalez has been duly appointed legal representative of her father's estate, all estate taxes have been paid, and all beneficiaries, actual or "potential," have been identified and consented to the release of all remaining bank deposits to Ms. Gonzalez, UBS now asserts for the very first time that language in a standard, unsigned, form, styled "General Terms and Conditions of Accounts" (a copy of which is annexed as Exhibit 5 to the Ochs Aff.),[2] entitles it to continue to refuse to turn over the monies held in Account 440 more than three years after Dr. Martinez's death; the specific terms are as follows:[3]

**Legal Process; Collection Charges**

A fee will be imposed for any legal process served on the Bank with respect to each account maintained and the Bank may charge an additional fee for any expenses incurred and for consultation with in-house attorneys, as well as for outside counsel whom the Bank may consult.

Should it be necessary to commence collection proceedings through a collection agency or attorney, or the Bank's attorneys, all reasonable fees, commissions, charges and other costs will be added to the amount which is owed to the Bank.

---

[1] On or about December 23, 2005, approximately $6 million was transferred from UBS Account 440 to another financial institution. UBS agreed to the release of this money only on condition that Ms. Gonzalez agree to indemnify UBS against any claims to the monies released; UBS had also earlier agreed to release deposits held in other, joint, accounts with Ms. Gonzalez and her father, on the same terms, and only if Ms. Gonzalez agreed to allow UBS to take more than $80,000.00 in "costs" and "fees" for itself, and its lawyers, which it did, "relating to the disposition" of the monies in the account in accordance with the terms of the account opening forms.

[2] The Account Application for Account 440 references "General Terms and Conditions of Accounts" (*see* ex. 1 at Section 3, page 2 of 10, and Section 10, page 8 of 10).

[3] Counsel for UBS provided our office with a copy of the form of General Terms and Conditions of Accounts (form 04/04-genterm) for UBS Wealth Management, upon which counsel indicated UBS was relying. While the form of "General Terms and Conditions of Accounts" provided by counsel appears to be that for UBS Wealth Management (*see* ex.5), the Account Application form indicates it was generated by UBS Private Banking. *See* ex. 1.

*[Apparent basis for withholding Legal Fees Amount:]*

**Consulting Legal Counsel; Freezing of Account**

If the Bank deems it necessary, the Bank may, at the Depositor's expense, consult with legal counsel regarding the Depositor's account and/or retain legal counsel to appear in any legal proceeding affecting the Depositor's account in which the Bank is a party. The Bank is not obligated, however, to institute, defend or engage in any legal proceeding involving the Depositor's account unless the Bank is first indemnified to the Bank's satisfaction.

Without limiting the foregoing, the Bank specifically has the right to consult with legal counsel in any jurisdiction which it deems necessary for the purpose of determining your successor(s), heir(s), executor(s), administrator(s) and distributee(s) prior to distributing the assets in your account(s) upon your death.

The account(s) will be debited for any and all fees, expenses, legal liabilities, losses, demands, damages, costs, charges, counsel fees or other expenses incurred by the Bank in connection with the foregoing.

*[Apparent basis for withholding Estate Tax Amount:]*

You agree that, upon the death of any accountholder, your account may be frozen until the Bank determines to its satisfaction (i) that all U.S. estate taxes due in connection with such accountholder's death have been paid, (ii) that no such taxes are payable or (iii) that the Bank has no liability for such taxes.

Ex. 5 at Page 3 of 12.

3.        Nature of this Action

        Plaintiff commenced this action against UBS and its wholly-owned Singapore

subsidiary, alleging fourteen separate causes of action. The gist of the action is that in or about

the summer of 2004 UBS took on an additional/new role as estate planner and/or

investment/asset advisor/manager in connection with millions of dollars belonging to Dr.

Martinez already on deposit at UBS, and/or being transferred in from other financial institutions;

that, in connection with this addition/new role, UBS owed special duties of care and loyalty to

Dr. Martinez as fiduciary, investment advisor, and asset manager, separate and apart from their

relationship as bank and depositor; that as a result of its/their breach of those duties, gross

negligence, mismanagement and self-dealing, UBS unnecessarily exposed Dr. Martinez's Estate

to estate taxes it had promised could be avoided through an estate tax plan which UBS devised

but, as a result of its own neglect and/or fault, failed to implement, as well as unnecessary

litigation and litigation expense with one rival claimant to the Estate.  Plaintiff seeks as against

UBS, as a measure of damages, among other damages, the more than $1.5 million in estate taxes

it was required to pay, and millions of dollars in litigation and litigation-related expenses it

incurred with a former beneficiary of Dr. Martinez's Trust.

## ARGUMENT

### UBS IS REQUIRED TO RELINQUISH ALL REMAINING DEPOSITS TO MS. GONZALEZ

The facts are that Ms. Gonzalez has been duly authorized as legal representative

of her father's estate, all beneficiaries have been identified and have consented to the release of

all remaining deposits to her, and all estate taxes have been paid.  Nothing in the law, account

opening documents, or logic would permit the Bank to hold indefinitely deposits to indemnify

itself against claims based on the Bank's own malfeasance and wholly unrelated to the account,

estate taxes or the deposits in that account.

1.　　　　UBS  is duty bound to turn over the
　　　　　remaining deposits

A long-standing, cardinal rule of banking is that a bank must release and disburse

its customer's funds "in conformity with his/her directions." *See, e.g., Crawford v. West Side*

*Bank*, 100 N.Y. 50, 53, 2 N.E. 881 (1885); *Eastchester v. Mt. Vernon Trust Co.*, 173 A.D. 482,

159 N.Y.S. 289 (2d Dep't 1916); *First African Trust Bank v. Bankers Trust Co.*, 1995 U.S. Dist.

LEXIS 9952 (S.D.N.Y. 1995). Ms. Gonzalez, as duly appointed legal representative of the Estate of her father and sole trustee of the New York-based trusts established by Dr. Martinez during his lifetime, stands in the shoes of her father *qua* depositor, as a matter of law and the account documentation. *See, e.g., Thomson v. N.Y. Trust Co.,* 266 A.D. 384, 42 N.Y.S.2d 145 (1st Dep't 1943); McKinney's N.Y. Estate, Powers and Trusts Law § 11-1.1 (2007).

Accordingly, UBS has the legal duty to release and disburse the funds in Account 440 to Ms. Gonzalez in conformity with her instructions.

2.      UBS's Form of General Terms and
        Conditions for its Accounts Provides
        No Basis to Withhold the Account
        Deposits

Even UBS will have to concede when it comes time in its answering papers that it cannot even offer a basis to hold approximately $2.3 million in Account 440 (the remaining deposits after deducting the Estate Tax and Legal Fees Amount in dispute from the total), and has done so only as leverage, during the pendency of this lawsuit, to prevent Ms. Gonzalez from exercising her lawful right (and, indeed, duty) to gain the release of all deposits and to have them distributed to the beneficiaries in accordance with her father's wishes. As detailed below, UBS's attempt to hold on to the Estate Tax and Legal Fees Amounts is also baseless: the very account forms upon which it purports to rely do not permit it, the law does not provide for it, and it otherwise makes no sense that UBS would be entitled to do so in all the circumstances.

(a)     UBS has No Right to Withhold The
        Estate Tax Amount

UBS grounds its purported right to hold the Estate Tax Amount on language found at the end of the final paragraph of the provision titled "Consulting Legal Counsel; Freezing of Account," in UBS's General Terms and Conditions of Accounts; that language, in its entirety, provides:

> You agree that, upon the death of any accountholder, your account may be frozen until the Bank determines to its satisfaction (i) that all U.S. estate taxes due in connection with such accountholder's death have been paid, (ii) that no such taxes are payable or (iii) *that the Bank has no liability for such taxes*.

Ex. 5 Page 3 of 12 (emphasis added).

UBS essentially argues that – conceding all estate taxes have been paid and none are owed (thus satisfying prongs (i) and (ii)) – subsection (iii) should be read to allow the Bank to hold the Estate Tax Amount in the event UBS is found liable to Ms. Gonzalez for claims having nothing whatever to do with the administration of the Account. The instant suit does not seek to have the Bank pay the taxes already paid, but seeks damages for breach of duties and for gross negligence, caused by UBS as estate planner (not bank depositee), in exposing the Estate to such taxes in the first place. Research has revealed no case in which this language has been used to permit a bank to hold a depositor's money to indemnify itself for its own breach of duty – because of and/or whatever the underlying measure of damages. That is because the words and meaning of the text will not support such a construction.

The language of subsection (iii), whether alone or together with the other subsections, plainly refers to liability by a bank depositor or the Bank *to the government* for unpaid estate taxes, not liability of the Bank to its client for unnecessarily exposing that client to estate taxes *already paid*, in breach of its own separate duties. If the provision was meant to provide a blanket indemnity for the Bank against claims brought by a client whatever the legal theory or damages sought, then those words would be there but they are not; and, the Court may/ought not read these words into the provision which are not otherwise there. *See, e.g., Kaufman v. Guest Capital, L.L.C.*, 386 F. Supp.2d 256, 274 (S.D.N.Y. 2005); *Reiss v. Fin. Performance Corp.*, 97 N.Y.2d 195, 764 N.E.2d 958, 961, 738 N.Y.S.2d 658 (N.Y. 2001).

UBS's isolated, if expansive, reading of subsection (iii) impermissibly ignores the company that provision keeps, moreover. The ancient maxim *noscitur a sociis* – "a word is known by the company it keeps" or "a thing is known by its associates" – has long guided courts in the interpretation of words or terms susceptible to more than one meaning. *See* Williston on Contracts, 4th ed., § 32.6 (1990). The doctrine instructs courts to give words and terms a common sense interpretation in light of their context(s) and associated words/terms. As the Supreme Court long ago observed:

> Noscitur a sociis is a rule of construction applicable to all written instruments. Where any particular word is obscure or of doubtful meaning, taken by itself, its obscurity or doubt may be removed by reference to associated words. And the meaning of a term may be enlarged or restrained by reference to the object of the whole clause in which it is used.

*Virginia v. Tennessee*, 148 U.S. 503, 519 (1893). *See also Farm Bureau Mut. Ins. Co. v. Carr*, 255 Kan 591, 528 P.2d 134 (Kan. 1974) ("We cannot believe the term relied on by the company, inserted in the middle of the other four, was intended to mean anything so radically different from its fellows as the company would suggest."); *N.Y. Metal Ceiling Co. v. City of N.Y.*, 133 A.D. 110, 117 N.Y.S. 632 (1st Dep't 1909) (the word "sidewalls" in the phrase "ceilings, sidewall and wainscotings" "should also be read as referring to work of similar character, that is to say, to interior work" on sidewalls); *Opperman v. Heritage Mut. Ins. Co.*, 1997 S.D. 85, 566 N.W.2d 487 (S.D. 1997) (a loader was not encompassed within an insurance policy provision covering "vehicles or self-propelled machines or autos you manufacture, process or warehouse," because the "loader was not in the chain of distribution or held at the point of sale," as are described by the words "manufacture, process or warehouse").

Of slight distinction from *noscitur a sociis* is the ancient maxim *ejusdem generis* – "of the same kinds, class, or nature" – which states that where general words follow an

enumeration of specific items, the general words are read as applying to other items akin to those specifically enumerated. *See U.S. v. Sec. Mgm't Co., Inc.*, 96 F.3d 260 (7th Cir. 1996); Williston, § 32.10. Said another way, where specific items of limited meaning are followed by items of general meaning, the items of general meaning are interpreted to be limited by the preceding items of limited meetings.[4] *See* Corbin on Contracts, Vol. 5, at 309-18, n.594 (1982).

These principles of contract interpretation are fully applicable to the word "liability" here: In the language advanced by UBS, two items of specific meaning – "such taxes . . . *payable*" and "all U.S. estate taxes *due* in connection with such accountholder's death [to be] *paid*" – are followed sequentially by one item of general meaning: "liability for such taxes." Accordingly, the subsequent, general item must be construed as *ejusdem generis* with the first two, and specific, items, to wit: estate taxes that must be paid to taxing authorities upon the death of the accountholder. UBS's construction of the word "liability" in the third item – apparently, to encompass liability having to do with the mismanagement of assets *prior* to the accountholder's death, which itself gave rise to estate tax exposure – is simply not *ejusdem generis* with the concept encompassed by the first and second prongs; and, thus, ought not to be read that way. And, whatever circumstances there might be to hold a bank liable for estate taxes of its banking customer, that circumstance certainly is not present where, as here, those taxes have already been paid, and from the very account the Bank two years later continues to "freeze."

UBS's reading of subsection (iii) would not only convert it into a broad indemnification provision but one beyond and unrelated to the account, the deposits or estate taxes. But, were there any doubt as to the meaning of subsection (iii), that doubt would be

---

[4] It should be noted that the inverse is not true, *i.e.*, where items of general meanings are followed by items of specific meaning, the preceding items of general meaning are *not* limited by the following items of specific meaning. *See City of Corpus Christi v. Bayfront Assocs., Ltd.*, 814 S.W.2d 98, 104 (Tex. Ct. App., 13th Dist. 1991).

resolved in Ms. Gonzalez's favor, not UBS's.  Another well-established maxim of contract

interpretation, *contra proferentum* – "against the one bringing forth" – provides that any

ambiguity in a term will be construed against the party that imposed its inclusion in the contract,

or, more accurately, against the interests of the party who imposed it.  *See, e.g., Stewart v.*

*Marvel*, 101 N.Y. 357, 4 N.E. 743 (N.Y. 1886).

   In the context of the form of General Terms and Conditions for UBS accounts,

*contra proferentum* instructs that any ambiguity in a term should be construed against UBS, the

drafter of its form.  UBS advances an interpretation of the term "liability for such taxes" which

would provide itself with rights far exceeding the scope of the remainder of the provision, to say

nothing of the contract itself.  If UBS intended to give itself a blanket indemnity, or otherwise

the right to hold its customers' monies (in perpetuity), for claims of mismanagement, *vis-à-vis* its

unsigned form of General Terms and Conditions of Account, it has the duty to make that clear

from the language it chose to employ.  In this case, the language employed fails to provide that

right.

   Reading the provision in the manner UBS would have this Court read it would

result in UBS being entitled to keep the Estate Tax Amount if it were ultimately found in the

underlying action that its own malfeasance unnecessarily exposed Dr. Martinez's Estate to such

taxes, an absurd and ultimately nonsensical result.  In other words, the Bank gets to keep its

customers' money because the bank may be liable *to its customer* for that money as a result of its

own wrongdoing.  A long-standing, and basic, canon of contract construction is that "a rational,

sensible and practical construction . . . should be preferred to one which is unreasonable, absurd

or impracticable." *See, e.g., McPhee & McGinnity Co. v. Union Pacific R. Co.*, 158 Fed. Rep. 5,

17 (8th Cir. 1907); *Pataki v. N.Y. State Assembly*, 190 Misc. 2d 716 (N.Y. Sup. Ct., Albany

County 2002); *see also Auerbach v. Mr. & Mrs. Foster's Place, Inc.*, 128 Misc. 875, 877 (N.Y. Mun. Ct., City of N.Y. 1927) ("the court will endeavor to give to the contract a rational and just construction"). UBS's labored interpretation of the words "liability for such taxes" fails this most basic test. *See, e.g., Superb Gen. Contr. Co. v. City of New York*, 39 A.D.3d 204, 833 N.Y.S.2d 64 (1st Dep't 2007); *Matter of Lipper Holdings v Trident Holdings*, LLC, 1 A.D.3d 170, 171, 766 N.Y.S.2d 561 (1st Dep't 2004).[5]

Beyond merely producing a completely irrational, nonsensical and absurd result, UBS's interpretation of this provision also gives it a *de facto* lien and indemnity against Dr. Martinez's assets for liability to Dr. Martinez's Estate which it did not bargain for and did not write into the account opening forms – a result which funs afoul of the long-standing principle that "when a party is under no legal duty to indemnify, a contract assuming that obligation must be strictly construed to avoid reading into it a duty which the parties did not intend to be assumed." *Weissman v. Sinorm Deli*, 88 N.Y.2d 437, 446, 669 N.E.2d 242, 246, 646 N.Y.S.2d 308, 312 (N.Y. 1996). The language invoked by UBS simply does not create the kind of broad indemnity that it seeks to secure for itself.

In short, neither the forms, the law or common sense would sanction the Bank's continuing "freeze" on the account to indemnify it for estate taxes already paid from that very account.

(b)    UBS Has No Right to Withhold the
       Attorneys' Fees Amount

UBS also attempts to convert the provision in its standard account forms entitling it to fees and expenses incurred in connection with the administration of an account, into a broad

---

[5] The reverse side of UBS's argument also calls into question its *bona fides*; as, presumably, if Ms. Gonzalez dropped her claims against UBS, the Bank would no longer have a right to withhold the monies from her. Thus, UBS's unwillingness to release these monies is a self-obvious, thinly-veiled attempt to gain leverage in the litigation and nothing else.

attorneys' fees provision, permitting it to freeze deposits to cover fees not yet incurred, and in an amount unknown, as it sees fit, in defense of claims having nothing whatsoever to do with the administration of the account or the distribution of deposits; the specific language is as follows:

> If the Bank deems it necessary, the Bank may, at the Depositor's expense, consult with legal counsel regarding the Depositor's account and/or *retain legal counsel to appear in any legal proceeding affecting the Depositor's account in which the Bank is a party.*
>
> Without limiting the foregoing, the Bank specifically has the right to consult with legal counsel in any jurisdiction which it deems necessary *for the purpose of determining your successor(s), heir(s), executor(s), administrator(s) and distributee(s) prior to distributing the assets in your account(s) upon your death.*
>
> The account(s) will be debited for any and all fees, expenses, legal liabilities, losses, demands, damages, costs, charges, counsel fees or other expenses incurred by the Bank *in connection with the foregoing.*

Ex. 5 at page 3 of 12 (emphasis added).

Again, the Court need go no further than the very language of the provision. The language used is simple, limited, and straightforward; it authorizes the Bank to reimburse itself only for the costs of expenses actually incurred "in any legal proceeding affecting the Depositor's account . . . ," including, specifically, those costs and expenses associated with "determining your successor(s), heir(s), executor(s) attorney(s) and distributee(s) prior to the distributing the assets in your account(s) upon your death" and to deduct such costs and fees from the depositor's account which the Bank has incurred "in connection with the foregoing." The gravamen of the underlying lawsuit involves claims of mismanagement, breach of duty and gross negligence against UBS *qua* investment advisor/investment manager, and those claims have nothing whatever to do with the accounts, the deposits, distributions, or determining the "successor(s), heir(s), executor(s), attorney(s) and distributee(s) of the accounts/deposits."

UBS's own prior interpretation/understanding of this very provision undermines its newly-minted position. When the Bank previously agreed to release other deposits from other accounts beneficially owned by Ms. Gonzalez,[6] it agreed to do so only if it received a release of liability in connection with such distribution and it were permitted to debit $80,000.00 from the accounts purportedly representing the "costs and fees" allegedly incurred by the Bank in connection with the administration of the accounts and the distribution of deposits:

> that, from the amount shown in paragraph 1 [the distribution amount], there should be deducted $80,000.00 in respect of the Accounts' service fees, including reasonable fees and expenses for legal services, related to the disposition of assets in Accounts YR-325504 and YR-201995, payable to UBS pursuant to the contributed obligations applicable to such Accounts . . .

Ex. 6, page 5, ¶ 3 (e).

While UBS apparently would read into the provision a right to take future projected, costs and fees, defending claims against it for malfeasance unrelated to matters "affecting" a depositor's account or the disposition of deposits in that account, nothing in the plain language of the provision it drafted says that. In the absence of very clear language providing for attorneys' fees, the courts will not construe one that is not written out. *See, e.g., Horowitz v. 1025 Fifth Avenue., Inc.,* 34 A.D.3d 248, 825 N.Y.S.2d 5 (1st Dep't 2006); *DiPerna v. American Broadcasting Cos.,* 200 A.D.2d 267, 612 N.Y.S.2d 564 (1st Dep't 1994).

\*      \*      \*

In sum, this Court should not permit UBS to cherry-pick language tucked away in unsigned, standard account administration forms to give itself a lien and indemnity, and/or a

---

[6] The form of release agreement prepared by UBS in connection with the release of certain funds from Dr. Martinez's account at UBS is annexed as Exhibit 6 to the Ochs Aff.

reimbursement of legal fees, for claims arising out of UBS's estate planning and financial advising misconduct.

CONCLUSION

For all the foregoing reasons, UBS should be directed to release all monies on deposit in Account 440 to Ms. Gonzalez without condition.[7]

Dated: New York, New York
          January 18, 2008

Respectfully Submitted,

_____
Mitchel H. Ochs, Esq.
Chase C. Vergari, Esq.
Anderson & Ochs, LLP
61 Broadway Suite 2900
New York, New York 10006
Attorneys for Plaintiff

---

[7] Ms. Gonzalez will, at the appropriate time, seek a full accounting with respect to the deposits, including, without limitation, the investments made (or not made) and the management fees taken from Account 440, and at this time expressly reserves her right to seek additional damages, prejudgment interest, and like costs and damages, as appropriate.